IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL FOREST PRODUCTS           )
EASTERN DIVISION, INC.,             )
                                    )
                Plaintiff,          )
                                    )
        v.                          )       Civil Action No. 05-1337
                                    )
BPB AMERICA, INC.,                  )       Judge Cercone
                                    )       Magistrate Judge Hay
                Defendant.          )
_____

BPB AMERICA, INC.,                  )
                                    )
                Cross-Claimant,     )
                                    )
        v.                          )
                                    )
UNIVERSAL FOREST PRODUCTS           )
EASTERN DIVISION, INC.,             )
                                    )
                Cross-Defendant.    )

REPORT AND RECOMMENDATION

I.      RECOMMENDATION

        It is respectfully recommended that defendant's motion for summary judgment on

the claims asserted by plaintiff (Doc. 56) be granted, and that defendant/counterclaim plaintiff's

motion for partial summary judgment on Count II of the counterclaim (Doc. 55) be granted as

well.

II.     REPORT

        Plaintiff, Universal Forest Products Eastern Division, Inc. ("UFP"), commenced

this action against BPB America Inc. ("BPB"), for allegedly breaching the contract the parties

entered into after BPB delivered a product to UFP that UFP claims it did not order.

According to the record, UFP provided construction services as a subcontractor for a project at Bloomsburg University involving the construction of four student dormitory buildings ("the Project").  Complaint, ¶ 5 (Doc. 1).  In connection with the Project, UFP was to provide labor and material including prefabricated exterior wall panels made of wood framing and exterior gypsum board.  Complaint ¶¶ 6, 7; Defendant's Statement of Facts ("SOF") ¶ 13 (Doc. 56-3); Plaintiff's Counter Statement of Facts ("CSOF") ¶ 13 (Doc. 70).

To that end, on or about October 26, 2004, Michael Willette, a UFP employee, placed a telephone order with a BPB customer service representative at BPB's facility in Carrollton, Kentucky, for the purchase of gypsum board.[1]  SOF ¶ 15; CSOF ¶ 15.  UFP placed a second verbal order for gypsum board with BPB on December 15, 2004, and on December 17, 2004, four additional verbal orders were placed.  SOF ¶¶ 23, 25.  A final order was placed on January 26, 2005.  SOF ¶ 51; CSOF ¶ 51.  In all but one instance, UFP's Purchase Orders describe the gypsum board being ordered as: **5/8" 4x8 EXT DRYWALL SQ EDGE FIRECODE**.  Complaint, Exh. A; SOF ¶ 61; CSOF ¶ 61.  See Defendant's Appendix of Exhibits ("Def. Exh.") 25, 26, 51 (Docs. 57-64); Plaintiff's Appendix of Exhibits ("Pl. Exh.") 9 (Doc. 73).[2]

---

[1]We note here that BPB has not included UFP's October 2004 Purchase Order in its appendix, representing that it could not be found and claiming that UFP has produced it for the first time in UFP's appendix filed in conjunction with the instant motions.  BPB has also argued, persuasively and without dispute from UFP, that the document submitted by UFP as the October 2004 Purchase Order is inauthentic and, thus, inadmissible as BPB did not change its branding information to "CertainTeed Gypsum, Inc.," which is the vendor listed on the purported purchase order, until November of 2006.  See Defendant's Reply Appendix of Exhibits ("Def. Reply Exh.") 3, 4 (Doc. 77).  This notwithstanding, because the information contained on the purported purchase order is identical to that of the other purchase orders it has little bearing on our decision here.

[2]It appears that on January 26, 2005, 5/8" 4x9 EXT DRYWALL SQ EDGE FIRECODE was also ordered.  Id.

BPB's written Order Acknowledgments, which it issued to UFP after each order was placed, however, describe the gypsum board ordered by UFP as: **5/8 Type X 4x8 TE**. Complaint ¶ 13, Exh. B; SOF ¶¶ 19, 60; CSOF ¶¶ 19, 60.[3]  As well, it appears that each of the advance shipping notices issued by BPB to UFP, BPB's bills of lading that accompanied each shipment to UFP, and BPB's invoices issued to UFP for the shipments described the gypsum board as **5/8 Type X 4x8 TE.**[4] Id.  See Def. Exhs. 23, 24, 28, 29, 31, 32, 34, 35, 36, 37, 38, 39, 41, 42, 43, 45, 46, 47, 48, 50, 52, 53, 54, 56; Pl. Exhs. 6, 10.

UFP nevertheless accepted all of the goods that BPB shipped and subsequently affixed the gypsum board it received onto the wooden frames of the wall panels it was assembling for the Project.  SOF ¶ 59; CSOF ¶ 59; Plaintiff's Additional Facts ("AF") ¶ 22 (Doc. 70); Defendant's Response to Additional Facts ("RAF") ¶ 22 (Doc. 75).  As of March 18, 2005, approximately eighty-nine percent (89%) of the wall panels had been assembled -- and, thus, eighty-nine percent (89%) of the gypsum board that UFP had ordered from BPB had been consumed -- and approximately eighty percent (80%) of the wall panels had been erected at the Project site which had, to some extent, been covered with brick veneer, masonry and trim. Complaint ¶¶ 21, 24; SOF ¶¶ 70, 71; CSOF ¶¶ 70, 71; Def. Exh. 9: Ellenberger Dep., pp. 218-219, 221, 250.

On March 17, 2005, UFP discovered that some of the gypsum board that had been supplied by BPB and used to fabricate the wall panels had degraded from exposure to rain.  A

---

[3]The Order Acknowledgment for the October 26, 2004 Order does not appear to be of record. See Complaint, Exh. B; CSOF ¶ 19.

[4]Although it appears that several of BPB's Order Acknowledgments and Advance Shipping Notices could not be found, it does not appear to be disputed that the gypsum board was consistently described in the same manner on each document.  See SOF ¶ 60; CSOF ¶ 60.

subsequent examination revealed that the wall panels had been fabricated with interior gypsum board instead of exterior gypsum board. Complaint ¶ 20; SOF ¶¶ 66, 67; CSOF ¶¶ 66, 67. UFP notified BPB of the fact that it had anticipated receiving exterior gypsum board but had instead received interior gypsum board in telephone calls made on March 17 and 18, 2005. SOF ¶ 69; CSOF ¶ 69. On March 22, 2005, UFP wrote a letter to BPB outlining the problems resulting from the fact that interior gypsum was used on the Project rather than the exterior gypsum it contends was ordered. Complaint ¶ 23, Exh. D. UFP alleges that as a result of the alleged shipping error it has incurred significant damages, including having to acquire exterior gypsum board, remove the previously installed brick veneer, masonry, trim and wall panels, deface the wall panels already assembled, install new wall panels and pay a subcontractor to install new brick veneer, masonry and trim. Complaint ¶ 24.

Plaintiff filed the instant complaint on August 23, 2005, bringing claims against BPB for breach of contract (Count I), breach of implied warranties/fitness for a particular purpose (Count II), and breach of implied warrantied/merchantability (Count III). On November 11, 2005, BPB responded to the complaint and brought counterclaims against UFP for breach of contract in which it seeks payment for goods that UFP allegedly wrongfully rejected (Count I), and payment for the exterior gypsum board that UFP subsequently ordered and accepted which was used to replace the interior board erroneously installed at the Project (Count II).

BPB has now filed a motion for summary judgment in which it seeks judgment in its favor on all the claims brought against it by UFP and a motion for partial summary judgment in which it seeks judgment on Count II of the counterclaim.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file,

4

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.BPB's Motion for Summary Judgment on All of UFP's Claims

BPB argues that it is entitled to summary judgment on all of UFP's claims because UFP failed to provide BPB with timely notice that it considered BPB in breach of their contract as is required under the Uniform Commercial Code ("UCC"), before it is entitled to a remedy.

Section 2-607(3) of the UCC, as adopted by Pennsylvania, provides that where a tender has been accepted, "(1) the buyer must within a reasonable time after he discovers or

5

should have discovered any breach notify the seller of breach or be barred from any remedy."  13 Pa. C.S.A. § 2607(c).  "What is a reasonable time for taking any action depends on the nature, purpose, and circumstances of such action." 13 Pa. C.S.A. § 1204(b).  "The policies behind requiring notification have been stated as: (1) opening the way for settlement through negotiations between all parties; and (2) minimizing the possibility of prejudice to the seller by allowing ample opportunity to cure the defect, inspect the goods, investigate the claim, or do whatever may be necessary to properly defend or minimize damages while the facts are fresh in the minds of the parties." In re Latex Gloves Products Liability Litigation, 134 F. Supp. 2d 415, 423 (E.D. Pa. 2001), vacated in part on other grounds, Whitson v. Safeskin Corp., 2001 WL 34649695 (E.D. Pa. April 6, 2001), citing Standard Alliance Industries, Inc. v. Black Clawson Co., 587 F.2d 813, 826 (6th Cir.1978), cert. denied, 441 U.S. 923 (1979) (citations and quotation omitted).  See Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 298 (3d Cir. 1961) (Recognizing that prejudice to the seller caused by the delay is also a relevant consideration).

Further, while the question of whether notice was given within a reasonable time is normally a question for a jury to decide, where there are no disputed facts and the buyer clearly should have been aware of the breach the question may be decided as a matter of law.  Id.; In re Latex Gloves Products Liability Litigation, 134 F. Supp. 2d at 423; Piezo Crystal Co. v. Uddeholm Corp., 870 F. Supp. 589, 597 (M.D. Pa. 1994), citing RAD Services, Inc. v. American Refining Group, Inc., 330 Pa. Super. 308, 312, 479 A.2d 565, 567 (1984).   Moreover, the burden is on the buyer to establish that notice of the breach was given within a reasonable time after the breach was discovered or should have been discovered.  Vanalt Electrical Construction Inc. v. Selco Manufacturing Corp., 2007 WL 1340912, at *4-5 (3d Cir. May 8, 2007) ("[W]e conclude that the Pennsylvania Supreme Court would place the burden of proving reasonable notice on the

buyer") ; <u>Liberty Steel Products, Inc. v. Franco Steel Corp.</u>, 57 F. Supp. 2d 459, 466-67 (N.D.

Ohio 1999), <u>quoting</u> <u>Standard Alliance Industries, Inc. v. Black Clawson Co.</u>, 587 F.2d at 823

("[I]nasmuch as section 2-607 operates as a condition precedent to any recovery, the burden of

proof is on the plaintiff to show that notice was given within a reasonable time").

   Here, BPB does not dispute that it was promptly notified of the problem in March

of 2005 when UFP discovered that interior gypsum had been used in the Project but contends

that the problem should have been discovered much earlier.  Specifically, BPB argues that

interior gypsum board differs from exterior gypsum board in both color and the way it is labeled

and that UFP, as a merchant buyer that holds itself out as having skills and knowledge in

purchasing construction materials, should therefore have recognized that interior gypsum board

had been delivered upon receipt or, at the latest, when the board was used to fabricate the wall

panels.  UFP's failure to notify it of the problem at that time, BPB argues, deprived it of any

meaningful opportunity to cure the problem or minimize UFP's claimed damages.[5]

   With respect to the difference in color between the two boards, BPB has

submitted physical examples of its interior and exterior gypsum wallboards which show that the

paper facing of the interior gypsum wallboard is off-white in color and the paper facing of the

exterior gypsum wallboard is a dark grayish brown.  Def. Exhs. 61, 62.  Moreover, it appears

undisputed that the lighter, off-white sample is representative of the interior board that BPB sent

to UFP prior to March 17, 2005 and that the darker brown sample is representative of the

replacement exterior gypsum board sent after March 17th.  <u>See</u> Def. Exh. 9: Ellenberger Dep., p.

---

   [5]As previously discussed, it is undisputed that when BPB was notified of the problem, approximately eighty-nine percent (89%) of the wall panels had been assembled and approximately eighty percent (80%) of the wall panels had been erected at the Project site which, to some extent, had been covered with brick veneer, masonry and trim.  Complaint ¶¶ 21, 24; SOF ¶¶ 70, 71; CSOF ¶¶ 70, 71; Def. Exh. 9: Ellenberger Dep., pp. 218-219, 221, 250.

249; Def. Exh. 14: Archinal Dep., pp. 105-06; Def. Exh. 67: Bowser Dep., pp. 34-55; Def. Exh.

66: Bowser's Before and After Photographs.  See also Def. Exh. 65: Stipulation re authenticity of

photographs.

   More importantly, BPB has also submitted the report of UFP's own expert, Harry

B. Archinal, as well as his deposition testimony in which he states that "[g]ypsum board when

shipped visually shows as dark grey when sheathing and light gray when interior wall board,"[6]

and that the distinction applies to gypsum board in general and not just to that manufactured by

BPB.  Def. Exh. 63: Archinal Report, p. 2; Def. Exh. 14: Archinal Dep., p. 102.  That opinion is

corroborated by BPB's expert who has submitted a report in which he states that there are

"significant color differences between paper-faced interior wallboard and paper-faced exterior

sheathing" generally, and that:

> Face paper color is often used within the construction industry to
> distinguish different types of gypsum board, particularly
> specialized products such as moisture resistant gypsum board and
> exterior sheathing.  With the exception of moisture resistant board
> and gypsum board intended to receive a skim coat of plaster,
> interior wallboard is usually white or ivory.

Def. Exh. 18: Toole Report, p. 4, ¶ No. 5.  This evidence appears to suggest that UFP should

have known when the wallboard was delivered that it was not exterior gypsum board as had

allegedly been ordered.

   UFP, nevertheless counters arguing that BPB's representation that the color

differences between its interior and exterior products is the same across the industry is in dispute

and points to the Affidavit of David Phelps, Vice President of UFP's purchasing, in which he

---

[6]Mr. Archinal also testified that the term "sheathing" is used within the gypsum wallboard
industry to indicate exterior gypsum board or gypsum board with a water-resistant core that is faced with
water-repellant paper and designed for use as sheathing on the exterior of buildings.  Def. Exh. 14:
Archinal Dep., p. 150.

states that exterior gypsum board comes in a variety of colors including brown, yellow, silver, white, light green, blue and purple.  Pl. Exh. 12: Phelps Aff. ¶ 11.  To support his position, Mr. Phelps has attached color photographs of Georgia Pacific's yellow exterior gypsum board known as DensGlass Gold, Georgia Pacific's silver exterior gypsum board known as DensGlass Silver, and National Gypsum's brochure which purports to describe the various colors of its exterior gypsum board.  Id.  UFP also cites to the deposition testimony of Keith Clark, a BPB employee, in which he testified that BPB itself sells exterior gypsum board that is both white and brown.  Pl. Exh. 14: Clark Dep., pp. 86-90.

In our view, however, this evidence is insufficient to create a genuine issue of fact for trial.  First, neither of the Georgia Pacific products referred to are paper faced products like that at issue here, but, rather, have glass mat facings on their front and back sides.  See Exhs. to Phelps Aff.  As argued by BPB, however, there is no evidence of record that UFP anticipated receiving anything other than paper-faced exterior gypsum wallboard from BPB.  Indeed, not only did Mr. Willette testify that at the time he was not familiar with BPB's glass mat product, GlasRoc, but that he did not believe that the Parker facility had any GlasRoc products and that they did not start purchasing glass mat products until "January or so of 2005" when UFP came to an agreement with *Georgia Pacific* "to try and push *their* DensGlass Silver at one of [UFP's] plants in North Carolina."  Reply Exh. 6C: Willette Dep., pp. 41-42, 385-7 (emphasis added).  Moreover, Mr. Ellenberger was unaware of anyone at UFP's Parker, Pennsylvania facility who had ever received gypsum wall board from BPB that was not paper faced.  Reply Exh. 6B: Ellenberger Dep., p. 141.[7]

---

[7]Moreover, it is undisputed also that the replacement product provided by BPB, which UFP contends is what it had originally ordered, is paper faced.  See SOF ¶ 72; CSOF ¶ 72; Def. Exh. 62; Def. Exh. 9: Ellenberger Dep., p. 249.

Further, review of the National Gypsum brochure submitted by UFP shows that all of the products described as having green, blue and purple paper facing are not exterior wallboards but are for use on interior walls.  See Exh. to Phelps Aff: National Gypsum Brochure, pp. 57, 58, 59, 68, 69, 72, 73, 77, 80, 81, 82.[8]  As such the brochure does not support Mr. Phelps' statement that "National Gypsum manufactures Exterior gypsum products that are light green, blue and purple."  Phelps Aff., ¶ 11.

Finally, although Mr. Clark testified that BPB sells exterior wall board that is both white and brown it is clear when his testimony is read in its entirety that the white exterior board to which he is referring is BPB's GlasRoc product which, as previously discussed, is not a paper faced product like that allegedly ordered in this case, but, rather, is one that has a glass mat face. Pl. Exh. 14: Clark Dep., pp. 90-91.  Indeed, Mr. Clark described BPB's GlasRoc as "fiberglass faced" adding that "[a]nybody could discern the difference between interior or exterior and paper faced and GlasRoc."  Id., p. 91.  Moreover, Mr. Clark also testified that, "[e]xterior sheathing, whether it's half-inch or five-eighths is a dark brown gray color, you know, kind of a blend, front and back."  Id., p. 87.  And, when asked how a person in the business, such as a contractor would visually distinguish between interior and exterior, Mr. Clark replied that his "first thought is color of the board" and that "[i]nterior board is white."  Id., pp. 88-89.  He went on to say that the only other colors of interior or exterior gypsum of other manufacturers that he knows of is Georgia Pacific's yellow exterior board which, as previously discussed, is not a paper-faced board.  He concluded by stating that while interior five-eighths 8s and exterior five-eighths 8s feel the same since both are paper faced products, one is white and one is brown.  Id., pp. 91-92.

---

[8]In addition, to the extent that UFP has included pages from the brochure that refer to products appropriate for exterior walls, there is either no mention of the color of the paper facing or the facing appears to be other than paper.

Thus, Mr. Clark's testimony, if anything, appears to support BPB's position that exterior paper faced gypsum board which UFP purports to have ordered is universally dark brown or gray and interior paper faced gypsum wall board is white and, therefore, does not serve to create a question of fact.

  BPB has also presented evidence that its interior gypsum board is labeled differently from its exterior gypsum board which, it contends, should have alerted UFP that it had not received exterior wall board. Indeed, it appears undisputed that while the "end tag" of BPB's interior gypsum wallboard reads "**ProRoc brand Type X Gypsum Board 5/8" x 8' TE**," and has "tapered edge gypsum panel" written above the words "Type X," the exterior board label states that it is "**ProRoc brand Sheathing Treated Core Type X 5/8" x 8' SE**," and above the word "sheathing" states that it is a "square edge gypsum panel." Def. Exhs. 61, 62: Physical Samples; Complaint ¶ 17. See SOF, ¶ 81; CSOF ¶ 81. BPB reiterates that within the gypsum wallboard industry "sheathing" indicates exterior gypsum or that which has a water-resistant core (thus, "Treated Core") and is faced with water-repellent paper designed for use as sheathing on the exterior of buildings and that neither term appeared on the labels of the products received by UFP. Def. Exh. 14: Archinal Dep., p. 150; Def. Exh. 68: American Society for Testing and Material ("ASTM") International Standard Specifications for Gypsum Board, ¶¶ 1.16, 4.1.1. BPB also notes that although both labels indicate that the product is "Type X," the parties' experts have indicated that the designation refers to standard of fire resistance that is used broadly within the gypsum industry and does not refer to exterior wall board. Def. Exh.: 14: Archinal Dep., p. 138; Def. Exh. 18: Toole Report, p. 3, ¶ No. 1.

  Moreover, BPB has submitted evidence that whether the board has a square edge or a tapered edge is indicative of whether it is intended for interior or exterior use. Indeed, UFP's

own expert testified that boards used for "[e]xterior use [are] generally square edged or tongue and groove" and that "the tapered edge is almost always for interior use." Def. Exh. 14: Archinal Dep., pp. 135-137. As well, BPB's expert has stated in his report that:

> The visible differences in edge types typically associated with the two types of gypsum products ... [are] that exterior sheathing typically has square edges because the joints are rarely taped and covered with joint compound while interior wallboard typically has tapered edges to facilitate taped and finished joints.

Def. Exh. 18: Toole Report, p. 4 ¶ No. 5. Because the wall board received by UFP indicated that the boards had a tapered edge ("TE"), BPB argues that UFP should have been alerted to the fact it did not get exterior gypsum board as it purportedly ordered.

UFP counters arguing that the labels are ambiguous and because the facts and inferences regarding BPB's labels are in dispute summary judgment is unwarranted. Specifically, UFP disputes that it was universally accepted during the relevant time period that "Type X" referred to a standard of fire resistance and that it was therefore somehow justified in assuming that "Type X" referred to exterior wall board. See Pl. Exh. 12: Phelps Aff. ¶ 6; Pl. Exh. 3: Fisher Aff. ¶ 9; Pl. Exh. 11: Gordon Aff. ¶¶ 11-12; Pl. Exh. 19: Phelps Dep., p. 56. We cannot agree.

First, UFP has admitted not only that "Type X" is a designation established by the ASTM that is broadly used throughout the gypsum industry to indicate a standard of fire resistance but that the term applies to both interior and exterior gypsum wall board. SOF ¶ 82; CSOF ¶ 82; Pl. Exh. 7: Telesz Aff. ¶ 11. If, in fact, "Type X" refers to the ASTM fire rating, it is unclear how it could not be accepted as such in the industry. Moreover, if, in fact, *interior* gypsum wall board can be "Type X," as UFP has argued, it is difficult to understand how "Type X" could have been interpreted by UFP to mean *exterior* wall board. This is particularly true as

UFP has admitted that the computer training module it uses to train its employees on gypsum products specifically explains that "Type X" relates to fire resistance and not whether the material is exterior.  <u>See</u> SOF ¶ 99; CSOF ¶ 99.

In this manner, UFP's argument that it should not be required to know what "Type X" meant because BPB's customer service representative, Wendy O'Connor, who apparently took the first order place by Mr. Willette in October of 2004, testified that she did not know what it  meant, is also unavailing.  Not only has BPB provided the Court with the errata sheet which accompanies Ms. O'Connor's deposition testimony wherein she indicates that "Type X" "is a standard, and that five-eighths board, which is Type X, is fire retardant," Reply Exh. 6: Exh. F, pp. 203 & errata entry No. 160, but even if Ms. O'Connor did not know what "Type X" meant we cannot see how her lack of knowledge about the product being ordered is relevant to whether UFP should have known that it received something other than what it ordered when the shipment was delivered.

UFP also argues that the fact that the gypsum it received was not labeled with the terms "exterior" or "Sheathing" or "Treated Core" is irrelevant since it is undisputed that it was not labeled "interior" either.  UFP then goes on to argue that because the exterior gypsum its personnel had previously encountered was marked with a large stamp denoting that it was "exterior," the absence of a label indicating that the gypsum it received was "interior" somehow justified it in believing that it had received exterior gypsum.  Pl. Exh. 13: Strauser Aff. ¶ 8; Pl. Exh. 16: Moore Aff. ¶ 8; Pl. Exh. 17: Ryhal Aff. ¶ 8.  The difficulty with UFP's argument, however, is that if, in its experience, exterior gypsum is clearly marked "exterior" shouldn't it have expected the shipment it received to be marked "exterior" too, since that is apparently what it ordered?  Under these circumstances, the fact that the wallboard was not marked "interior"

13

does not, in our view, permit the inference that it was reasonable for UFP to believe it had received exterior gypsum.

Finally, with respect to the product labeling, UFP disputes BPB's representation that "TE" on the product label, which UFP concedes means tapered edge, unequivocally identifies the gypsum board as interior citing to Mr. Clark's testimony and BPB's own website. While it is true that Mr. Clark testified that a customer could request exterior gypsum with tapered edges, the entirety of his testimony in response to the question, "Can you obtain exterior that's tapered?," was "I don't know, but I don't think so. A customer could request anything special, and it can be done, probably." Pl. Exh. 14: Clark Dep., p. 92. Mr. Clark's testimony therefore indicates that exterior does not normally come with a tapered edge although it could probably be done if the customer ordered something special. Because there is no evidence of record in this case that UFP ordered anything special, Mr. Clark's testimony does not create an issue of fact.

Similarly, neither the pages of BPB's website nor the National Gypsum brochure attached to Mr. Telesz's and Mr. Phelps' affidavits, respectively, appears to support a finding that either BPB or National Gypsum sell the type of exterior wall board that UFP allegedly ordered with a tapered edge. See Pl. Exh. 7: Telesz Aff. ¶ 10; Pl. Exh. 12: Phelps Aff. ¶ 12. Indeed, the only boards advertized on the website pages provided by UFP that have tapered edges are the ProRoc Exterior Soffit Board and the ProRoc Exterior Soffit Board Type X, which are used for the "underside of eaves, carport ceilings, canopies and other commercial and residential exterior applications with indirect exposure to weather" and, thus, do not appear at issue here. As well, UFP has failed to draw any distinctions between the eighteen different types of board listed in the National Gypsum brochure or identified which of those products is comparable to

14

the type of gypsum board it allegedly ordered and expected to receive from BPB.  Rather, UFP

has cited to the brochure generally and asks the Court, and thus a jury, to speculate that because

some of the boards that are advertized for exterior use come with a tapered edge that the

wallboard UFP ordered in this case comes with a tapered edge which, in our view, falls short of a

specific fact necessary to survive summary judgment.  Moreover, BPB has argued, and UFP does

not dispute, that National Gypsum's paper faced exterior gypsum board, like that at issue here, is

its Gold Bond Brand Gypsum Sheathing depicted on page 58 of the brochure, which only comes

with a square edge.  See Reply Exh. 6.[9]

      BPB also argues that UFP could have discovered the alleged breach by reviewing

the numerous documents it received from BPB regarding the various shipments including the

Order Acknowledgments, the Advanced Shipping Notices, the bills of lading and invoices for

completed orders -- none of which matched UFP's purchase orders.  See SOF ¶¶ 60, 61; CSOF

¶¶ 60, 61; Def. Exhs. 23, 24, 25, 26, 28, 29, 31, 32, 34, 35, 36, 37, 38, 39, 41, 42, 43, 45, 46, 47,

48, 50, 51, 52, 53, 54, 56; Pl. Exhs. 6, 9, 10.

      Indeed, as previously discussed, it is undisputed that UFP's purchase orders

indicate that it ordered **5/8" 4x8 EXT DRYWALL SQ EDGE FIRECODE**, and that all of

BPB's documents indicate that **5/8 Type X 4x8 TE** had been ordered.  As BPB contends, it

would appear that had Mr. Willette, who was responsible for ordering the wall board and

reviewing BPB's Order Acknowledgments and Advanced Shipping Notices, compared them to

its purchase orders it would have been apparent that BPB's documents did not state that the wall

---

[9]Further, although not argued by BPB, regardless of whether the exterior gypsum at issue here comes with a tapered edge as the label on the board UFP received indicated, it is undisputed that UFP ordered exterior gypsum with a *square* edge.  Thus, even if the "TE" designation did not put UFP on notice that it had not received exterior wall board it nevertheless should have been clear that it did not otherwise get what it ordered.

board was exterior as had been ordered, did not state that the material was square edged as had been ordered, did not indicate that the wall board was "FIRECODE" as had been ordered, but did contain the terms "Type X" and "TE" which were not included on UFP's documents. Whether or not Mr. Willette failed to review the documents or simply did not understand their terms does not negate the fact that the discrepancies in these documents provided UFP with sufficient information to alert it to the fact that a product other than what it ordered was being delivered or, at the very least, that it needed to make some inquiries.

Indeed, UFP has presented an affidavit from Sean Adams, who was responsible for receiving and unloading the first shipment from BPB, in which he attests to the fact that he noticed that the description of the material on the bill of lading did not match the description on UFP's purchase order and took steps to verify that the product being delivered was, in fact, what UFP ordered. It is not entirely clear what evidentiary value Mr. Adam's affidavit has for UFP, since, as argued by BPB, the fact that a UFP employee noticed that the bill of lading did not match the purchase order appears to provide support for BPB's position that UFP should have discovered the alleged breach at that time.[10] Moreover, the record shows only that Mr. Adams asked the truck driver who made the delivery whether the product on the truck was the product that UFP ordered and was informed by the truck driver that it was. Pl. Exh. 7: Telesz Aff. ¶ 2; Pl. App. 8: Adams Aff. ¶ 8. Not only has the truck driver, who worked for a common carrier, not been identified but there is no evidence of record to suggest how he verified that the shipment

---

[10]For this reason, perhaps, BPB has not asked the Court to disregard Mr. Adam's affidavit as it might have given that neither Mr. Adams' identity or the fact that he noticed a discrepancy in the documents and discussed the matter with the truck driver who delivered the boards, was disclosed to BPB during discovery or at any time thereafter even though that information was responsive to BPB's discovery requests and UFP was apparently aware of the information. Rather, it appears that BPB has learned of Mr. Adams' existence, as well as that of Messrs. Telesz, Gordon, Strauser, and Ryhal, for the first time in UFP's brief in response to the instant motion. See Reply App. No. 3.

was what UFP ordered, that he even knew what UFP had ordered, that he has any knowledge whatsoever about wallboards or that he contacted anyone who might know. There is certainly no evidence that he contacted anyone from BPB to verify what had been shipped or what UFP was receiving.

In addition, it appears that UFP's own policies require that where questions arise because a bill of lading does not match UFP's purchase order the person receiving the shipment is to contact the office administrator, Mr. Ellenberger, the General manager of UFP's Parker facility, or Mr. Telesz, the Plant Manager. Reply Exh. 2: Ellenberger Dep., pp. 50-54, 152-54, 159-60. There is no evidence here, however, that Mr. Adams contacted any of these people. The fact that Mr. Adams may have asked an unknown truck driver to verify that the shipment being delivered was what had been ordered rather than follow its own policies designed to detect shipping errors does not appear to be a reasonable effort to reconcile an acknowledged discrepancy in the descriptions of what was ordered and what was being delivered.[11] Under these circumstances, we cannot find that UFP has presented evidence which would support a finding that UFP could not have discovered the error earlier.

In this manner, Piezo Crystal Co. v. The Uddeholm Corp., 870 F. Supp. 589 (M.D. Pa. 1994), upon which UFP largely relies, is easily distinguishable from the instant case. In that case, during the 1970's and early 80's, the plaintiff routinely ordered a grade of steel from the defendant known as "UHB-20." In April and August of 1985, a sales representative for the

---

[11]We note here that BPB has also presented evidence that the UFP employees responsible for fabricating the wall panels using the gypsum board provided by BPB are not only trained to recognized different material that are identified in engineering shop drawings but are supposed to consult the drawings and visually confirm that the material being used is that required by the project first. Reply Exh. 2: Ellenberger Dep., pp. 113-116, 234-36. UFP has not pointed to any evidence which would suggest that this procedure was followed either.

17

defendant visited the plaintiff's manufacturing plant in order to prepare price quotes for "UHB-20" steel. Thereafter, the plaintiff resumed purchasing steel from the defendant and between March of 1986 and December of 1990 placed at least five orders and received more than twelve deliveries. All of the plaintiff's paperwork associated with the orders and deliveries as well as that of the defendant -- including quotations, invoices, order forms, order acknowledgments, purchase orders and work orders -- all reflect that UHB-20 steel had been ordered and delivered. The grade of steel actually delivered, however, was "UHB-20C." The only indication that the wrong grade had been delivered was a blue tag on the outside of the container which identified the steel as UHB-20C, which the defendant argued was sufficient to place the plaintiff on notice that it had received a grade other than what was ordered. The Court, however, disagreed finding that because the differences in the grades could not be discerned with the naked eye and, more importantly, that every document associated with the sale including those created by the defendant indicated the UHB-20 steel had been ordered and delivered, it could not say as a matter of law that the plaintiff should reasonably have discovered the breach when the steel was delivered and provided notice at that time. Id. at 597-98. Moreover, it was the plaintiff's standard practice to verify that it was receiving what it had ordered by comparing the order forms with the packing slips and invoices. Id. at 596.

       Here, unlike in Piezo, the documentation associated with the sale did not match. Rather, as UFP concedes, the purchase orders it generated and the bills of lading generated by BPB were different – a fact which UFP was well aware of at the time of delivery. Moreover, as previously discussed, it appears that the gypsum board UFP ordered and that which it received were different in color and, thus, discernable by the naked eye. As such, Piezo does not support

18

UFP's position that it could not have known of the breach before March of 2005, when the boards began to deteriorate.

In this manner. it appears that the facts of this case are more analogous to those in Liberty Steel Products, Inc. v. Franco Steel Corp., 57 F. Supp 2d 459 (N.D. Ohio 1999), upon which BPB has relied.  In that case, which also involved the purchase of steel, the plaintiff ordered Grade G PVQ steel from the defendant but received Grade C PVQ steel which was not discovered until almost one year after the shipment had been delivered.  The plaintiff brought suit and the defendant moved for summary judgment arguing that the plaintiff failed to provide timely notice of the alleged nonconformance of the steel as required under the UCC.  Although the Court noted that what constitutes a "reasonable time" is generally a question of fact, it determined that the facts before it were not were not in dispute and that the issue could be decided on summary judgment.  Specifically, the Court found that the plaintiff should have discovered the non-conformity well before it notified the defendant of the breach given the fact that the defendant had forwarded a Sales Order Confirmation acknowledging its order for Grade C steel rather than Grade G steel and that the plaintiff had a policy in effect requiring its staff to compare purchase orders to Sales Order Confirmations and bring any discrepancies to the buyer's attention.  Id. at 467-68.  Moreover, the three documents that accompanied the shipment when it was delivered also identified the steel as Grade C and not Grade G.  In addition, the Court pointed to the fact that in subsequently preparing the steel for its customer, the plaintiff obtained the physical and chemical analysis from the certificate it received from the defendant which indicated that the steel was Grade C, as well as its own computer records which identified it as Grade G.  The Court noted that even if the employees responsible for comparing the documentation were not trained in the chemical makeup of the steel, they were certainly capable

19

of distinguishing between a "C" and a "G." Id. at 468. Noting that the transaction involved a sale of goods between merchants which are held to a higher standard than consumers, the Court concluded that, under the circumstances, notice one year after acceptance of the non-conforming steel and ten to twelve months after the plaintiff should have known of the breach was not given withing a reasonable time. Id. at 469.

   In the instant case, like in Liberty Steel Products, Inc., none of the documentation that UFP received from BPB regarding the shipments, including the Order Acknowledgments, the advanced shipping notices and the bills of lading, matched its purchase orders which should have alerted UFP to the fact that the shipments did not conform to its orders. This is particularly true as not only was no special training needed to recognize the discrepancies but when the discrepancy was noticed, UFP failed to follow its own procedures to ascertain whether it actually got what it had ordered. Thus, under Liberty Steel Products, Inc., giving notice of the non-conforming goods over four months later does not appear to be within a reasonable time. See Pace v. Sagebrush Sales Co., 114 Ariz. 271, 274, 560 P.2d 789, 792 (1977) (Finding that notice given over four months after the buyer accepted goods it alleges it did not order, was unreasonable where the buyer, a merchant held to a higher standard of dealing, had ample opportunity to inspect the goods and discover any defects").

   Finally, to support its position that UFP should have discovered the alleged breach before March of 2005, BPB points to the testimony of UFP's own expert wherein he states that if UFP's employees had been trained the problem would have been discovered and that UFP had many opportunities to do so before the wall panels were installed into the buildings. Specifically, BPB points to the following excerpt from Mr. Archinal's testimony:

   Q: Perhaps I can narrow it for you. Mr. Archinal, do
     you know whether UFP's employees that were

20

responsible for fabricating the wall panels that were
at issue in this case were trained in the recognition
or use of different types of gypsum wall board such
as interior and exterior?

A:   Everything points to the fact that they were not
trained.

Q:   Why do you say that?

A:   Because if they had been trained, they would have
discovered the problem and abated the problem
before it became a massive problem.

*   *   *

Q:   The statement in your report, Mr. Archinal, that
starts with, "It is evident that UFP had no point of
comparison due to lack of familiarity with both the
technical labeling and the visual color," do you see
that statement?

A:   Yes.

Q:   And what forms the basis for that statement?

A:   Well, if they did – since we are using UFP
generically across the whole spectrum there – they
would have caught the problem.

*   *   *

Q:   And the person who is responsible for receiving
material like gypsum wallboard, as we discussed
earlier, and reading the bill of lading and comparing
it to the product, would you consider these labels for
these two products, 739 [exterior] and 741
[interior], to be confusing for that person?

A:   I would hope not.  But I don't know who reviewed
it.  And there are a number of points where this
could have been caught.
        I think the point is they [the interior gypsum
board] got from received in the assembly plant to
final installation out in the field.  Increasing more –
the ability to discern whether that was right or
wrong grew increasingly as we [UFP] got further
toward the end product.  Guys in the field should
have known that right away.

21

Def. Exh. 14: Archinal Dep., pp. 113-114, 210-211; Reply Exh. 5, Exh. A: Archinal Dep., pp.

194-195.  BPB also notes that Mr. Archinal's opinions comport with those of its own expert, Mr.

Toole, who states in his report that UFP employees should have discovered the problem by

reviewing the product descriptions on BPB's Order Acknowledgments and bills of lading, by the

visible difference in color, and by the visible difference in edge type.  Def. Exh. 18: Toole

Report, p. 4, ¶ No. 5.

UFP does not attempt to rebut Mr. Archinal's testimony but rather argues that Mr.

Archinal's testimony is irrelevant because he is only offering his opinion and not facts, and that

BPB can point to no duty of a buyer that utilizes only one particular product such as exterior

gypsum board to train its employees to recognize other types of products such as interior gypsum

board.

The difficulty with UFP's argument, however, is that Mr. Archinal's testimony

constitutes evidence that UFP would have and should have discovered the problem with the

gypsum board earlier had they been properly trained.  At the summary judgment stage of the

proceedings, UFP is then obligated to set forth evidence from which a fact finder could conclude

otherwise.  The fact that the evidence relied upon by BPB is the opinion of an expert does not

relieve UFP of its obligation in this regard particularly as the parties have obviously agreed that

expert testimony is required in this case.  See Liberty Mutual Group v. Intermatic Inc., 2006 U.S.

Dist. LEXIS 16349, at *6 (D. Ariz. March 31, 2006), citing Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 256 (1986) (Finding that summary judgement is properly entered where defendant's

expert's opinion was unrebutted by plaintiff and the fact that a jury might find the expert's

testimony self-serving or unworthy of belief has no bearing on summary judgment).  See also

A.G. Cullen Construction, Inc. v. State System of Higher Education, 898 A.2d 1145, 1172 (Pa.

22

Cmwlth. 2006) (Under Pennsylvania law, "where the subject matter involves special skill and training beyond the knowledge of a layman" expert testimony is required).  Because UFP has not offered any evidence to dispute Mr. Archinal's testimony that, had UFP's employees been trained, they would have and should have discovered the error before the wall panels were fabricated and installed on the buildings, there does not appear to be a genuine issue for trial.

Moreover, UFP's argument that it has no duty to train its employees to recognize interior gypsum board because it does not deal with that product is unpersuasive.  Having implicitly conceded that it has a duty to train its employees to recognize *exterior* gypsum board which it purports to deal with exclusively, it follows that they would know when they got something other than exterior gypsum board.  Stated differently, the fact that its employees were not specifically trained to recognize interior board should not have prevented them from knowing that they did not get exterior board which they apparently were trained to recognize.

This appears particularly true here where it is undisputed that between February of 2001 and October of 2004, UFP placed over 500 orders with BPB for gypsum board, more than 90 of which were placed with BPB's Carrollton, Kentucky facility and that, of those orders, more than 350 of them (and over 60 placed with the Carrollton facility) were for exterior gypsum board which were identified as such by the designations "SHTG" and "SHEATH."  SOF ¶ 8; CSOF ¶ 8.  See Def. Exhs. 12, 13: Summaries of UFP's Purchase Orders.  It is also undisputed that in June of 2003, UFP's Parker, Pennsylvania facility placed two orders with BPB's Carrollton facility for, and was sent shipments of, 5/8" 4'x8 Type X gypsum sheathing.[12]  SOF ¶

_____

[12]It is also undisputed that overall UFP purchased over 3.2 million square feet of gypsum board in 2003, over 6.3 million square feet in 2004, and over 6.9 million square feet in 2005.  Def. Exh. 10: UFP's Summary of Gypsum Drywall Purchases 2003-2005.  See SOF ¶ 7; CSOF ¶ 7.  UFP has also admitted in its public filings that the breadth of its product offerings, purchase expertise and service capabilities provide it with a significant competitive advantage and advertises that it "lead[s] the industry

23

11; CSOF ¶ 11.  See Def. Exh. 16: Bills of Lading dated 6/10/03 and 6/19/03.  Moreover, as

argued by BPB, there is no evidence that BPB's labeling of its 5/8 sheathing Type X product was

any different in October of 2004 than it was in June of 2003.  In fact, when asked at his

deposition whether he knew if the labeling was any different, Mr. Archinal testified that he

"would have to assume it would be the same" due to the consistency of ASTM designations.

Def. Exh. 14: Archinal Dep., p. 171.  See SOF ¶ 12; CSOF ¶ 12.  Under these circumstances, it

would appear that UFP should have recognized that the product it received from BPB for use in

the Project was not the exterior gypsum board that it anticipated receiving at the time it was

delivered.  As such, it was required to give notice of the alleged breach to BPB within a

reasonable time thereafter.  13 Pa. C.S.A. § 2607(c).  Because UFP did not notify BPB of the

breach until more than four months later, thereby depriving BPB of an opportunity to cure the

problem and minimize damages, it appears that UFP is barred from any remedy and BPB is

therefore entitled to summary judgment.

BPB's Motion for Partial Summary Judgment on Count II of the Counterclaim

        At Count II of its counterclaim against UFP, BPB has brought a claim for breach

of contract alleging that UFP ordered, received and accepted five orders of exterior gypsum

board from BPB between March 23, 2005 and April 6, 2005, for which UFP has failed to pay.

BPB contends that it is entitled to summary judgment on its breach of contract claim as the only

---

in designing, engineering and manufacturing wall panels," which are "designed and engineered to
specification."  Def. Exh. 2: UFP's 2006 Form 10-K, p. 5; Def. Exhs. 6, 7: Pages from UFP's Website.
See SOF ¶¶ 3, 4; CSOF ¶¶ 3, 4.  Under these circumstances, it is difficult to countenance UFP's
protestation that it should not be cast as an expert merchant buyer of gypsum.  See 13 Pa. C.S.A. § 2104
(Defining "merchant" as "[a] person who deals in goods of the kind; or otherwise by his occupation holds
himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction
...").

defense that UFP has raised thereto is that the cost of these purchases are offset by the damages UFP sustained as the result of BPB's earlier breach, i.e., allegedly shipping the wrong gypsum board, which BPB argues must fail as a matter of law.  See Def. Exh. H: UFP's Objections and Responses to BPB's First Set of Interrogatories, No. 11 (Doc. 55-4).  Specifically, BPB argues that UFP's claim that it is entitled to an offset does not preclude the entry of summary judgment since there is no material fact in dispute regarding whether UFP ordered and accepted the gypsum board at issue and that UFP is nevertheless not entitled to an offset under the UCC.

   With respect to the latter argument, it appears undisputed that under the UCC a buyer may set off liability against a price where the buyer's obligation to pay for goods it has accepted arises from the same contract as the breach.  Specifically, the UCC provides:

> The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

13 Pa. C.S.A. § 2717.  See UCC § 2-717, comment 1 ("To bring this provision into application the breach involved must be of the same contract under which the price in question is earned").  See also Total Foods Corp. v. Wilfran Agricultural Industries, Inc., 945 F. Supp. 100, 102 (E.D. Pa. 1996) ("[T]here is no right to set off under the UCC unless the breaches occurred as part of the same contract").  Moreover, the question of whether one or more contract exists is a question of law for the Court to decide.  Carlisle Corp. v, Uresco Construction Materials, Inc., 823 F. Supp. 271, 274 (M.D. Pa. 1993).

   BPB contends that because UFP's obligation to pay for the goods it accepted in March and April of 2005 arise under a different contract than that which UFP claims BPB breached, UFP is not entitled to an offset.  BPB points to the fact that the two contracts at issue were not only made at different times but have different terms.  Indeed, it appears that the first

25

contract was a verbal agreement made in October of 2004, for approximately 4,000 sheets of gypsum board at the price of $208 per thousand square feet whereas the second contract pertains to orders placed in March and April of 2005 for 1,950 pieces of exterior gypsum board at a price of $245 per thousand square feet and for 1,300 pieces at $240 per thousand square feet.

UFP counters that the second set of orders was merely for goods to replace the non-conforming goods that BPB originally sent to UFP and not for new goods and, thus, the "Replacement Invoices" are part of the original contract and do not constitute separate agreements.  To support its position, UFP relies solely on the deposition testimony of Mr. Willette where, when asked whether there came a time when UFP placed orders with BPB for exterior board to be installed to replace the interior board, he responded, "I think that took place almost immediately."  Pl. Exh. 2: Willette Dep., p. 369.

In our view, however, Mr. Willette's testimony is insufficient to permit the inference that the goods requested in March and April of 2005 were merely a request for goods that conformed to the original order placed in October of 2004 rather than separate orders. Indeed, Mr. Willette has simply agreed that there came a time when UFP placed orders with BPB for exterior gypsum board which was to be used to replace the interior board.  He did not testify that the exterior gypsum board ssubsequently shipped by BPB were substitutions for the previously shipped interior boards, that they were part of the same contract as the previously shipped interior board or that BPB ever agreed that the subsequent shipment was to be considered a "replacement" for goods previously shipped so that UFP was not obligated to pay for them.  In fact, as pointed out by BPB, when asked whether he knew of any reason why UFP should not pay for the exterior board that was subsequently sent, Mr. Willette responded that he

wasn't sure and that, "[n]othing [came] to mind."  Def. Reply Exh. A: Willette Dep., p. 377 (Doc. 78).

It therefore appears that the record is devoid of any evidence that would support a finding that BPB and UFP ever discussed or agreed to provide replacement goods for the interior board or, more specifically, that they ever discussed or agreed that the shipments made in March and April of 2005 were substitutions for the goods previously shipped and were part of that same contract.  Nor is there any evidence of a discussion or agreement that UFP would not have to pay for the latter shipments.  Under these circumstances, the orders placed by UFP in March and April of 2005, appear to constitute new contracts to which § 2717 does not apply.  As such, UFP is not entitled to offset the damages it sustained as the result of BPB's alleged breach in 2004 and, thus, UFP is unable to sustain its defense.

Because it is not otherwise in dispute that UFP placed orders with BPB for exterior gypsum board in March and April of 2005, that UFP subsequently accepted delivery of that board and that UFP has never revoked or attempted to revoke that acceptance, it appears that UFP is obligated to pay for those boards under the UCC.  See Def. Reply Exh. A, ¶¶ 16-18; Def. Reply Exh. B: Request for Admission No. 6 (Doc. 55-4).  See also 13 Pa. C.S.A. § 2607)(a) ("The buyer must pay at the contract rate for any goods accepted"); 13 Pa. C.S.A. § 2709(a) ("When the buyer fails to pay the price as it becomes due the seller may recover ... the price of: (1) goods accepted ...").  As such, BPB is entitled to summary judgment at Count II of its counterclaim.

Thus, the only question remaining is whether BPB is entitled to pre-judgment and/or post-judgment interest on the monies UFP owes it for the March and April 2005 shipments of exterior gypsum board.  UFP does not address BPB's argument that post-judgment

interest is owing and has premised its argument that BPB is not entitled to pre-judgment interest

on the notion that it was entitled to withhold its payment and offset it against BPB's breach

pursuant to 13 Pa. C.S.A. § 2717.  Because it is entitled to an offset, UFP concludes that there is

no obligation to pay a definite sum of money which is necessary before pre-judgment interest is

triggered.  See Hussey Metals Division of Copper Range Co. v. Lectromelt Furnace Division,

417 F. Supp. 964, 967-68 (W.D. Pa. 1976), aff'd, 556 F.2d 566 (3d Cir. 1977), citing

Restatement of the Law of Contracts (1932), § 337(a).

   Unfortunately, we have already rejected UFP's argument that it is entitled to an

offset and, thus, it appears that UFP still has an obligation to pay a definite sum of money as set

forth in the contracts it entered into with BPB in the spring of 2005.  See Def. Reply Exhs. D, E,

F: BPB's Invoices.  As such, it appears that BPB is also entitled to prejudgment interest at the

agreed upon rate of 18% per year and BPB's motion in this regard is properly granted as well.  Id.

See Fernandez v. Levin, 548 A.2d 1191, 1193 (Pa. 1998) (Under Pennsylvania law, "the right to

interest upon money owing upon contract is a legal right .... that begins at the time payment is

withheld after it has been the duty of the debtor to make such payment"); Pittsburgh Construction

Co. .v. Griffith, 834 A.2d 572, 590 (Pa. Super. 2003), allocatur denied, 852 A.2d 313 (Pa. 2004)

(Finding that the parties may stipulate to a higher rate of prejudgment interest than

Pennsylvania's statutory rate of 6% and upholding a contractual provision for 18% annual

prejudgment interest).

   For these reasons, it is recommended that defendant's motion for summary

judgment on the claims asserted by plaintiff (Doc. 56) be granted, and that

defendant/counterclaim plaintiff's motion for partial summary judgment on Count II of the

counterclaim (Doc. 55) be granted as well.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objection shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/  *Amy Reynolds Hay*
United States Magistrate Judge


Dated:   17 September, 2007

cc:      Hon. David Stewart Cercone
         United States District Judge

         All counsel of record by Notice of Electronic Filing

29